JOHN GRIMES *vs.* UNITED ELECTRIC RAILWAYS COMPANY.

JULY 20, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Baker, J. This is an action of trespass on the case for negligence brought by John Grimes, in his lifetime, hereinafter referred to as the plaintiff, and now prosecuted after his death, under the provisions of general laws 1923, chapter 333, secs. 7, 8 and 9, by Mary Grimes, his executrix. It is admitted that the plaintiff died from natural causes and not by reason of any act or omission of the defendant. The case was tried before a justice of the superior court sitting with a jury and resulted in a verdict for the plaintiff in the

sum of $11,000. Thereupon the defendant filed its motion for a new trial on the ground that the verdict was against the law and the evidence and the weight thereof, and, also, on the further ground that the damages were excessive. This motion was heard and denied by the trial justice and to this ruling the defendant excepted.

The case is now before this court on defendant's bill of exceptions based on the above exception, together with others taken during the course of the trial relating to alleged errors made by the trial justice in denying the defendant's motion for a directed verdict and in refusing certain of the defendant's requests to charge the jury; to certain portions of his charge to the jury; and to rulings on the introduction of evidence. All exceptions not briefed or argued by the defendant are deemed to be waived.

Defendant's exception thirty-seven presents the first question for consideration, namely, whether or not the trial justice erred in refusing to direct a verdict for the defendant. In passing upon this question it is necessary to describe the immediate surroundings of the place where the accident happened, as shown by the evidence. St. Paul's Roman Catholic Church is located at the junction of Broad street and Warwick avenue, the main entrance being on the westerly side of Broad street, some distance from the corner. At this point Broad street runs in a general north and south direction, and has two car tracks which are mainly located on the westerly half of the street. Outbound or southbound cars from Providence operate on the westerly track, and inbound or northbound cars to Providence on the easterly track.

Opposite the main entrance to the church there is a designated crosswalk, ten or eleven feet wide, extending in a slightly northeasterly direction across Broad street. There is a white post, indicating a regular stopping place for the defendant's outbound cars, with a street light attached thereto, on the sidewalk in front of the church, some twenty-two or twenty-four feet north of the northerly line of this

crosswalk. Forty feet north of this same northerly line, out in the traveled portion of Broad street, just east of the easterly track, there is a safety aisle or zone, twenty-four feet in length, with a fixed standard and light at each end; and northerly, about one hundred and twenty-three feet from that same line of the crosswalk, there is an overhead traffic light, synchronized with another such light further north, controlling traffic at a complicated intersection of a number of streets, including Broad street and Warwick avenue. Arnold avenue, which is referred to in the evidence, is south of the crosswalk, and runs into Broad street from the east, but does not cross it. From the center line of Arnold avenue to the south traffic standard of the safety zone the distance is approximately two hundred feet.

The plaintiff was struck on Broad street by one of defendant's inbound cars. The evidence for the plaintiff shows the following facts. The plaintiff, then sixty-nine years old, lived with his wife and daughter on Rhodes street in Cranston, and was employed as a night watchman at a department store in Providence. On the day of the accident, December 14, 1931, he left his home shortly before five o'clock in the afternoon to go to his work, intending to board one of the defendant's inbound cars in front of St. Paul's church on Broad street. As he stood on the westerly curb of Broad street about two feet south of the white pole above mentioned, he looked to his left and right, and saw only an inbound car at Arnold avenue approaching from the latter direction. He also noticed at that time that the light for traffic on Broad street was red. With these observations in mind, he started out into Broad street in a somewhat diagonal course toward the safety zone and proceeded across the outbound track. The evidence for the plaintiff then shows that as he was about to enter the inbound track, upon which was approaching the car he had previously seen at Arnold avenue and intended to board, he looked again to his right and saw the same car some fifteen feet south of the southerly line of the crosswalk, and approximately

fifty-five feet from where he then was. Under these conditions he continued in his course and was struck on his right side by that car just as he was clearing the inbound track, being thrown to the ground near the southerly standard of the safety zone. The plaintiff testified that it was not raining at the time of the accident and that, although it was damp, it was not misty, that the street lights were lighted and that there was a light on the car and on the standards of the safety zone. He estimated the speed of the car at between twenty-five to thirty miles an hour when he first saw it at Arnold avenue, but he could not give its speed when he again saw it fifteen feet south of the southerly line of the crosswalk, saying, in answer to a question by the court, that at that time the car appeared to him as going "about as fast as it always goes."

The evidence shows that it is about thirty-six feet from a point two feet south of the white pole, where the plaintiff was standing before starting to cross the tracks on Broad street, to the easterly rail of the inbound track at the southerly line of the safety zone, and, as already stated, two hundred feet from that same line of the safety zone to the center line of Arnold avenue. The evidence further shows that it is five feet between the two sets of car tracks, four feet eight and one-half inches between the two rails of the inbound track, and sixty-five feet from the southerly line of the safety zone to a point fifteen feet south of the southerly line of the crosswalk.

The evidence in behalf of the defendant relating to the accident varies considerably from that of the plaintiff. The motorman of the inbound car which hit the plaintiff testified, in substance, that although it was drizzling at the time, he had a clear and unobstructed view of the roadway for a considerable distance; that the street lights and the lights of the car were all lighted; that at Arnold avenue his speed was about fifteen miles an hour; that at or about this point he observed that the traffic light north of the safety zone was still at green, and he therefore continued toward

the scene of the accident at the same speed. He further testified that he first saw the plaintiff when the latter was on the westerly rail of the inbound track some ten feet from the car; that the plaintiff ran directly in front of the car, and that, although he immediately did everything that his thirty-one years' experience as motorman dictated and the appliances at his command permitted, the plaintiff was struck by the right front part of the car, which then stopped with its forward end about even with the southerly standard of the safety zone. In his testimony the motor man stated that, although he recollected that an outbound car passed him shortly before the accident, he paid no particular attention to it. The only other person on the car was a pensioner of the defendant company, who was riding on the front platform and standing to the left of the motorman.

It appears that at a previous trial of this case, unfinished because of the plaintiff's sudden death, the motorman testified differently as to the color of the traffic light while the car was proceeding from Arnold avenue to the place of the accident. Counsel for the plaintiff, reading from the official record in the other trial, asked him if he had not then testified in several instances that the traffic light north of the safety zone was set at red when he was passing Arnold avenue; that he continued to watch that traffic light to see whether it was going to turn from red to green, so that he could "get it"; and that it did not turn until he was about twenty feet south of the safety zone. To these questions the witness answered either that he did not remember, or that he was confused when he testified at the previous trial. He insisted that, as a matter of fact, the traffic light was set at green all the way from Arnold avenue, as he had testified in this trial. The portions of the record of the previous trial, which had been brought specifically to the witness's attention, were later introduced in evidence by the plaintiff as bearing upon the credibility of the witness.

This witness was contradicted in another important particular in his testmony. In cross-examination he denied

having told a former employee of the defendant company that he (the motorman) did not see the plaintiff before the latter was struck. The plaintiff, in rebuttal, produced this former employee as a witness, and he testifed that in answer to his question, "How did you come to hit him." (the plaintiff) "on the right side of the car?" the defendant's motorman said, "I didn't see him."

The defendant's pensioner, who was on the front platform with the motorman, testified that the car was moving at between 'fifteen and eighteen miles an hour, and that he first saw the plaintiff running across the inbound track five or six feet in front of the car. This witness gave no testimony with reference to the color of the traffic light as the car approached the safety zone, or as to an outbound car passing just before the accident. He denied, as did also the motorman, that he and the motorman were talking to each other.

The only other evidence referring to the accident produced by the defendant was an affidavit, read into the record without objection, of the motorman, since deceased, of the outbound car. In this affidavit it is stated that the witness saw the plaintiff leave the sidewalk and run apparently for the inbound car; that he ran in front of the outbound car when it was about fifteen feet from him; that the affiant rang his bell but that the plaintiff paid no attention to it; and that the car had to be stopped in order to avoid hitting the plaintiff. This witness also stated, that, when the plaintiff crossed the outbound track, the inbound car was about ten feet away, moving at a speed of about ten miles an hour, and that the plaintiff ran in front of that car, which then came to a quick stop. The witness did not stop his car again at that time because he was late.

The evidence in this case is conflicting and contradictory. What actually occurred just before and at the time of the accident depends largely upon what witnesses are to be believed. On a motion by the defendant for a directed verdict, it is well settled that it is the duty of the court to

adopt the view of the evidence most favorable to the plaintiff. In the circumstances of this case, it is clear that the evidence presents disputed questions of fact, both as to the plaintiff's due care and the defendant's negligence. A careful examination of the evidence does not justify us in saying that in so far as the plaintiff is concerned, the only proper inference that can be drawn from his conduct under all the existing conditions, is that he ran blindly in front of the inbound car in utter disregard of his own safety. Whether, under all the circumstances, he acted as an ordinarily prudent person was a question of fact for the jury to answer, having in mind, among other things, the place of the accident, the crosswalk and safety zone, traffic conditions including lights, distances, speed of the car, the observations which he had taken, and the fact that he had practically crossed the track when struck.

The defendant has cited a number of decisions relating to street railway accidents in which directed verdicts for defendants have been sustained. Many of these cases are not very pertinent to the present inquiry, because they deal with collisions of vehicles at street intersections or between an electric car and a vehicle, or with accidents at railroad crossings. Cases decided by this court and cases cited from other jurisdictions, which involve accidents to pedestrians crossing the tracks of a street railway company, in most instances emphasize the necessity of looking by the injured person immediately before he goes upon the track. Such decisions hold, in substance, that when the pedestrian has not looked at all, or has looked from a point at some distance from the track he was about to cross and then has not looked again before crossing, or, from the evidence, has clearly taken a chance in crossing, having seen the car approaching near at hand, then such pedestrian is guilty of contributory negligence as a matter of law. However, the evidence introduced in the instant case on behalf of the plaintiff does not bring him within the general scope of such decisions. In the present case the plaintiff testified positively that he

looked toward the approaching car, then at least fifty-five feet away, just before he went upon the track. The case of *Poland* v. *Union Railroad Co.*, 26 R. I. 215, upon which the defendant strongly relies, has very rarely been cited by this court since it was decided in 1904, and has apparently been heretofore limited strictly to the facts in that case. We so construe it now, as we do not consider it a decision of general application.

Under the evidence in the instant case and the law as we find it, the trial justice did not err in denying the defendant's motion for a directed verdict and in submitting the case to the jury. The defendant's thirty-seventh exception is therefore overruled.

Defendant, by its exceptions forty-five, forty-six, forty-eight and forty-nine, raises the issue of the defendant's liability, and contends that the trial justice erred in denying its motion for a new trial on the ground that the verdict was against the law and the evidence and the weight thereof. After a hearing on such motion the verdict was approved by the trial justice. Unless his decision upon the conflicting evidence is clearly wrong or is based upon a misconception of such evidence, it will not be disturbed by this court. *Wilcox* v. *Rhode Island Co.*, 29 R. I. 292; *Surmeian* v. *Simons*, 42 R. I. 334. Various vital points in the evidence herein are reasonably open to different conclusions. The weight to be given such evidence depended to a considerable extent on the credibility of the witnesses. The jury and the trial justice had the advantage of seeing and hearing them testify. Under all the circumstances we cannot say that the trial justice was clearly wrong in denying the defendant's motion for a new trial on the question of liability, or that he acted under a misconception of the evidence in deciding that issue. Defendant's exceptions next above referred to are overruled.

Defendant, by its exceptions forty-three and forty-four, urges that the trial justice erred in certain statements in his charge to the jury. Exception forty-three concerns a state-

ment at the very end of the charge when the trial court, after having fully instructed the jury as to the amount of recoverable damages, apparently in referring to the *ad damnum* in the writ said: "The limit is twenty-five thousand dollars, and under that you can find any amount you want to, but that is the limit." Standing alone, this remark would be improper, but it does not so stand. It cannot be isolated from its context. It should be read in connection with the entire charge which precedes it, and especially in connection with the additional instructions given by the trial justice shortly thereafter, when he again referred to the question of damages and said, "but bear in mind all the time that these injuries and these damages for which the plaintiff can recover must be attributable to being struck by this electric car." This exception is overruled.

Exception forty-four refers chiefly to an admonition by the trial court, at the beginning of his charge to the effect that, in considering the case, the jury should treat it as "between John Grimes, himself, who suffered these injuries, and the street railway company," eliminating any consideration of his widow, the executrix. The defendant contends that this preliminary statement made by way of caution was erroneous, but it presents neither argument nor authorities in support of its contention. This exception is overruled.

Defendant, by its exceptions thirty-eight, thirty-nine, forty and forty-one contends that the trial justice erred in refusing to charge as requested. We have examined the requests covered by these exceptions and find that such requests to charge in each instance, clearly invade the province of the jury, both as to questions of liability and damage. These exceptions are overruled.

The request to charge which is the subject of defendant's exception forty-two is as follows: "The present plaintiff, Mary Grimes, is not entitled to recover for any pain and suffering John Grimes may have had as a result of the injuries received in the street car accident." It is undis-

puted that the death of the plaintiff John Grimes was not caused by the accident of December 14, 1931. The action of trespass on the case for damages which he brought in his lifetime survived his death, and under the circumstances could be prosecuted by his executrix after his decease. In such case the new plaintiff by right of representation is entitled to recover "the damage actually sustained, without any vindictive or exemplary damages." G. L. 1923, chap. 333, sec. 9. Conscious pain and suffering, if the natural and probable consequence of the defendant's wrongful act, is an important element of damage in an action for personal injuries. John Grimes was entitled to recover such damages in his lifetime. We see no good reason, and none has been brought to our attention by the defendant, why recovery for conscious pain and suffering up to the time of his death should be denied under the circumstances of this case merely because the statute permits his executrix to bring the case to an end by a judicial determination on the merits. The statute is designed to protect a defendant under such circumstances against the assessment of vindictive or exemplary charges, but it does not curtail rights that have already attached and which were intended to be preserved. See 1 C. J. 187. This exception is overruled.

Defendant, by its exception forty-seven, contends that the damages awarded by the jury and confirmed by the trial justice are excessive. The rescript of the trial justice deals briefly in general terms with this issue. He finds that the plaintiff's medical expenses amounted to approximately $1400, that there was a loss of wages of $2184, and concludes that substantial justice has been done. Such a determination, without stating any reasons based upon the peculiar circumstances and evidence in this case, is of little assistance to us in reviewing his decision. In *Severiano v. Diwinsky,* 58 R. I. 237, 192 A. 467, we held that a trial justice in deciding a motion for a new trial ordinarily should state in a definite manner his considered opinion upon all material grounds relied upon in support of the motion.

Our examination of the evidence discloses the following facts. The plaintiff, in addition to bruises and contusions, suffered a fracture of the left humerus and of the left femur, resulting in considerable limitation of motion of the shoulder and knee joints. He was confined in a hospital from December 14, 1931, the day of the accident, to February 7, 1932, when he returned to his home and was there treated until July 15, 1932 by Dr. McCusker, who attended him while he was in the hospital. In October 1932 the plaintiff fell and fractured his right thumb and left collar bone. This fall is not properly attributable to the accident we are considering. The plaintiff at that time remained under Dr. McCusker's care for three weeks, during which period he also employed a male nurse at $16 a week or $48 in all.

A bill from Dr. McCusker for $700, dated December 9, 1933, was introduced in evidence by the plaintiff. The doctor testified that his charge to the plaintiff up to July 15, 1932, when he stopped treating the plaintiff for the injuries complained of in this case, was $600. It is evident that the bill of $700 includes treatment for which the defendant is not responsible. Neither should the defendant be charged with the $48 paid to the male nurse employed by the plaintiff during his incapacity resulting from his fall in October 1932.

In November 1932 the plaintiff suffered a cerebral hemorrhage. Doctor Ryan, his family physician, attended him on this occasion. He testified that the plaintiff's condition at that time was due to arterio-sclerosis and diabetes which he said are progressive ailments ultimately causing death. The plaintiff substantially recovered from the immediate effects of the cerebral hemorrhage. In May 1933 he strained his back in getting out of an automobile and Dr. Ryan treated him for a short time for this injury. On March 21, 1935, the plaintiff had an abdominal hemorrhage and Dr. Ryan ordered his removal to a hospital on March 24, where he died the following day. The death certificate gives "circulatory failure", which according to Dr. Ryan includes ail-

ments of the heart, kidneys and blood vessels, as the cause of death. There is no evidence that these ailments were attributable to the accident in the instant case, except in so far as the accident may have weakened the plaintiff's general condition. Doctor Ryan's bill of $30 was also charged against this defendant. We do not find the evidence sufficient to support this charge.

The plaintiff, in addition to all charges for nursing and for "medicines and equipment for treatment at home", asks for the sum of $200 claimed to have been expended for "innumerable other items of expense connected with the nursing and treatment of the plaintiff, including excess laundry, bed linen and towels, telephone calls, etc." The evidence respecting this item is so vague and indefinite as to leave it insufficiently supported by proof, and is therefore not properly chargeable to the defendant. The trial justice allowed the sum of $2184 for loss of wages, the plaintiff apparently having received $21 a week as watchman. The evidence reveals that the plaintiff did not work again after the accident involved in this case. There is no doubt that he suffered injuries in such accident which, apart from the cerebral hemorrhage, incapacitated him from doing any work for a considerable length of time, if at all. The evidence on this point and on the effect upon the plaintiff of the cerebral hemorrhage is not very clear or satisfactory and is reasonably susceptible of different inferences and conclusions. In view of the fact that we cannot say from the evidence before us that the trial justice was clearly wrong in allowing $2184 for loss of wages, we will not disturb his decision on this point.

From our examination of the evidence, we are of the opinion that it supports the finding that the monetary loss to the plaintiff was approximately $1022 for expenses and $2184 for loss of wages, a total of $3206. The difference between this sum and $11,000, which is the amount of the verdict approved by the trial justice, is given as compensation for pain and suffering, and such injuries of a permanent

nature as the plaintiff suffered by reason of the accident. These injuries consisted of some limitation of motion in the plaintiff's left shoulder and a greater degree of limitation of motion in the plaintiff's left leg, especially in the knee joint. By reason of this last-mentioned fact, the plaintiff's freedom of locomotion was restricted and he was compelled to use crutches in getting about. The shock which he suffered in 1932 and which was not caused by the present accident, also affected his left side. From the evidence it appears that the plaintiff lived approximately three years and three months after the accident involved herein. During this period he had a fall which injured him somewhat, a cerebral hemorrhage and a strained back, none of which were due to the accident. We do not wish to minimize in any way the pain and suffering caused the plaintiff by reason of his having been struck by the defendant's car. The evidence in the case, however, reveals no particular or unusual circumstances in connection with the plaintiff's injury caused by that accident, or during his recovery. It should also be noted that, according to the evidence, at the time of such accident the plaintiff already had symptoms of diabetes and Bright's disease, and very possibly some pain and discomfort suffered by the plaintiff following the accident were due to this condition.

The amount of damage in any case to be awarded for pain and suffering cannot be measured with exactness or precisely determined. Fair compensation for this element of damage is difficult to estimate. We have recently discussed this subject in *Peters* v. *United Electric Rys. Co.*, 57 R. I. 311, 189 A. 901. We are of the opinion, that, considering all the circumstances shown in the case at bar, from the evidence introduced, the defendant's contention that the damages awarded by the jury are grossly excessive is correct. Undoubtedly the jury was influenced in reaching the amount of its verdict because it did not fully differentiate between the physical ailments suffered by the plaintiff by reason of his natural condition, together with certain sub-

sequent injuries, and those injuries and losses which were due solely to the accident in question, and for which the defendant was properly liable.

In view of the fact that it is admitted that the plaintiff's failing health and general physical condition, together with the shock he suffered and certain other injuries sustained by him, are not traceable to the accident we are considering, and also that ample compensation, under all the circumstances, was allowed for his loss of wages, we find that the sum of $7000 more reasonably approximates fair compensation for the plaintiff without injustice to the defendant, taking into consideration the former's monetary loss, his injuries and his pain and suffering.

We have considered all the other exceptions briefed and argued by the defendant and find them to be without merit. For the reasons stated, all of the defendant's exceptions are overruled, except the forty-seventh exception, which is sustained on the ground that the damages awarded by the jury are clearly excessive.

The case is remitted to the superior court for a new trial, unless the plaintiff, on or before July 28, 1937, shall file in the office of the clerk of the superior court a remittur of all of such verdict in excess of $7000. If the plaintiff files such remittur, the superior court is directed to enter judgment on the vedict as reduced by the remittur.

*Cooney & Cooney, Joseph W. Grimes,* for plaintiff.
*Clifford Whipple, Earl A. Sweeney,* for defendant.